Jack G. Fruchter (JF-8435)
Jfruchter@aftlaw.com
Lawrence D. Levit (LL-9507)
Llevit@aftlaw.com
**ABRAHAM FRUCHTER & TWERSKY LLP**
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

RECEIVED
SEP 13 2006
U.S.D.C. S.D. N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

06 CV 7057

| | |
|---|---|
| ANTHONY CAIAFA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>IMAX CORPORATION, RICHARD L. GELFOND, FRANCIS T. JOYCE, BRADLEY J. WECHSLER and KATHRYN A. GAMBLE,<br><br>Defendants. | Civil Action No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

**INTRODUCTION**

1. This is a securities class action on behalf of all persons who purchased the common stock of IMAX Corporation ("IMAX" or the "Company") between October 28, 2004 and August 9, 2006 (the "Class Period"), against IMAX and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2. IMAX is an entertainment technology company, delivering cinematic presentations using proprietary IMAX, IMAX 3D and IMAX DMR technology. As of December 31, 2005, there were 266 IMAX theatres operating in 38 countries.

3. During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results. As a result of defendants' false statements, IMAX stock traded at artificially inflated prices during the Class period, reaching a high of $11.91 per share on February 7, 2005.

4. On August 9, 2006, after the markets closed, the Company announced its second quarter results, including that the SEC was investigating the timing of its revenue recognition and that the potential sale of the Company was not progressing. The press release stated in part:

> Separately, the Company provided an update regarding its exploration of strategic alternatives, including the possible sale or merger of the company. On March 9, the Company announced it had retained Allen & Company and UBS to explore strategic alternatives. Today the Company reported that while it received significant initial interest from multiple parties, its view is that there are presently no buyers who have indicated a willingness to acquire the Company at a valuation sought by the Board of Directors. Because interest remains from several parties at lower valuation, however, the Board has authorized the Company's bankers to explore these opportunities. This process is ongoing.
>
> * * *
>
> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods. The Company recognized revenue in the fourth quarter of 2005 on 10 theatre system installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed. Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were

substantially completed. the Company believes its application of the above accounting policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP. This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006, where revenue associated with the screen element has been deferred to a future period. The Company is cooperating in this inquiry.

5. On this news, IMAX's stock collapsed 40% to as low as $5.48 per share, before closing at $5.73 per share on volume of 13.2 million shares, 61 times the average volume.

6. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) the Company lacked requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts;

(b) the Company's financial statements were materially misstated due to its improper revenue recognition; and

(c) the Company was not able to be sold at the prices envisioned due to its lack of marketable films.

7. As a result of defendants' false statements, IMAX's stock traded at inflated levels during the Class Period, which allowed IMAX to amend its revolving credit facility in May 2006 and enabled it to shop the Company to potential sellers. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales sending them down more than 50% from their Class Period high.

## JURISDICTION AND VENUE

8. Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

9. (a) Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

(b) The Company's principal executive offices are located at 2525 Speakman Drive, Mississauga, Ontario, Canada, where the day-to-day operations of the Company are directed and managed.

**THE PARTIES**

10. Plaintiff Anthony Caiafa purchased IMAX common stock as described in the attached certification and was damaged thereby.

11. Defendant IMAX is an entertainment technology company, delivering cinematic presentations using proprietary IMAX, IMAX 3D and IMAX DMR technology. As of December 31, 2005, there were 266 IMAX theatres operating in 38 countries.

12. Defendant Richard L. Gelfond ("Gelfond") was Co-Chief Executive Officer ("Co-CEO") and Co-Chairman of IMAX.

13. Defendant Bradley J. Wechsler ("Wechsler") is, and at all relevant times was, Co-CEO and Co-Chairman of IMAX.

14. Defendant Francis T. Joyce ("Joyce") is, and at all relevant times was Chief Financial Officer ("CFO") of the Company.

15. Defendant Kathryn A. Gamble ("Gamble") was Vice-President, Finance, and Controller of IMAX.

16. Defendants Gelfond, Wechsler, Joyce and Gamble (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of IMAX's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after

their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶18, 20 and 22-30.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

17. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about IMAX. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of IMAX common stock was a success, as it: (i) deceived the investing public regarding IMAX's prospects and business; (ii) artificially inflated the price of IMAX's common stock; (iii) allowed defendants to complete an amendment to its revolving credit facility; (iv) allowed defendants to seek a buyer for the Company; and (v) caused plaintiff and other members of the Class to purchase IMAX common stock at inflated prices.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

18. On October 28, 2004, IMAX reported its third quarter 2004 financial results in a release which stated in part:

> IMAX Corporation today reported net earnings of $0.05 per diluted share for the three months ended September 30, 2004, significantly ahead of management's guidance for a breakeven quarter and the First Call mean of $0.01. This compares to a net loss of $0.07 per diluted share for the three months ended September 30, 2003. Excluding a half-cent gain from discontinued operations, earnings from continued operations were $0.04 in the third quarter of this year, as compared to a loss from continued operations of $0.07 in the year-ago quarter.
>
> * * *
>
> "In the third quarter, we not only met our financial goals, with net earnings, revenues and cash beating expectations, but we also continued to hit our strategic

goals, demonstrating strong progress towards our objective of making IMAX theatres synonymous with a premium-priced destination in the commercial entertainment marketplace," said IMAX(R) Co-chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler, "Our financial results are now starting to reflect the traction we are seeing in the commercial exhibition marketplace and we believe we are on track to meet our previously stated goal of earnings for the full year of $0.25 per share, before refinancing costs of $0.02 per share."

* * *

"The IMAX commercial theatre network continues to grow, as we just completed the best quarter in seven years in terms of signings, which serve as the best forward indicator of our near-term growth and predictor of financial results," continued Messrs. Gelfond and Wechsler, "The success that many of our customers are experiencing with IMAX DMR(R) films is leading to increased interest from exhibitors around the world, and we have not seen this level of inquiries in more than five years."

19. On this news, IMAX stock began a significant increase from the $5.50 range to above $7 per share by early November 2004.

20. On March 10, 2005, IMAX reported its fourth quarter and full-year 2004 financial results in a release which stated in part:

IMAX Corporation today reported net earnings of $0.26 per diluted share for the year ended December 31, 2004, ahead of the Company's previous guidance for net earnings of $0.23 per share, both after deducting $0.02 per share in bond refinancing costs. This compares to net earnings of $0.01 per diluted share reported in the prior year. Excluding bond refinancing costs of $0.02 per share, net earnings from continuing operations were $0.26 per diluted share for the year ended December 31, 2004. This compares to net earnings from continuing operations of $0.14 per diluted share for the year ended December 31, 2003, which exclude $0.13 per share of debt repurchase and refinancing costs.

* * *

"The year 2004 was a watershed for IMAX, as we significantly grew the commercial IMAX(R) theatre network and established it as a valuable new distribution platform for Hollywood event films," said IMAX Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. "Last year we achieved all of our key strategic goals, and that has started to translate into positive financial results, with 2004 earnings beating expectations and showing significant improvement over 2003. Given the strong start to the first quarter of 2005, we are increasingly confident that our growth will continue to accelerate, prompting today's upward revision to our 2005 estimates."

* * *

Continued Messrs. Gelfond and Wechsler, "Our recent multiplex deals reflect accelerating interest in IMAX from commercial exhibitors around the world, confirming that the IMAX MPX economic model is compelling for theatre operators. Hollywood movies in IMAX's format are also posting consistently impressive numbers, providing added incentive for multiplex operators to enter the IMAX business."

21. By the time of this announcement, IMAX's stock price was above $10 per share.

22. On May 5, 2005, IMAX reported its first quarter 2005 financial results in a release which stated in part:

> IMAX Corporation today reported first quarter 2005 earnings ahead of expectations, and earlier in the week delivered two major strategic initiatives regarding the accelerating growth of its domestic theatre network and the completion of its 2005 film slate. For the quarter ended March 31, 2005, IMAX reported net earnings of $0.03 per diluted share, above the Company's previously guided range of breakeven to $0.02 per diluted share. This compares to a net loss of $0.02 per diluted share reported for the three months ended March 31, 2004.
>
> "The momentum in our business is undeniable, as we just completed the best nine-month period of new theatre systems sales since 1997," said IMAX Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. "With double the number of signings and triple the number of installs versus the year-ago quarter, our first quarter results show that interest in IMAX continues to accelerate since the introduction of our multiplex-based theatre system last June."
>
> * * *
>
> "AMC's entree into the IMAX business marks a major milestone in our domestic commercial exhibition strategy, and the structure of the deal will allow us to generate significant additional recurring revenue for our business while quickly expanding the IMAX network," continued Messrs. Gelfond and Wechsler. "the addition of AMC not only bolsters IMAX's value proposition to other exhibitors, but also makes IMAX more attractive to Hollywood studios that want to release their event films to IMAX's growing network."

23. On August 4, 2005, IMAX reported its second quarter 2005 financial results in a release which stated in part:

> IMAX Corporation today reported earnings for the second quarter 2005, its best June quarter for theatre systems signings since 1997. For the quarter ended June 30, 3005, IMAX reported net earnings of $0.03 per diluted share, as compared to the

> Company's guided range of breakeven to $0.02 per diluted share. This compares to net earnings of $0.04 per diluted share reported for the three months ended June 30, 2004. Earnings from operations increased 7% to $5.4 million for the second quarter of 2005.
>
> "Our continued strong performance underscores the significant value IMAX delivers to all of its key constituents: commercial exhibitors, Hollywood studios and moviegoers," said IMAX Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. "Our commercial strategy is driving tangible business results for IMAX, including accelerating signings momentum, strong summer film performance and on-target financial results in the second quarter."
>
> * * *
>
> "We're very pleased with the strong openings of three new IMAX AMC theatres, including numerous sold-out shows in the first few weeks," continued Messrs. Gelfond and Wechsler. "It's been a pleasure working with AMC to fill in these key regional markets with commercial IMAX theatres, and we're particularly encouraged by the early financial performance of the sites, as the structure of the deal allows us to participate actively in the theatres' financial success."

24. On November 3, 2005 IMAX reported its third quarter 2005 financial results in a release which stated in part:

> IMAX Corporation today reported net earnings of $0.05 per diluted share for the quarter ended September 30, 2005. This is in line with the Company's guided range of between $0.04 and $0.07 per diluted share, and compares to net earnings of $0.05 per diluted share reported for the three months ended September 30, 2004. Earnings from operations increased 8% to $6.1 million for the third quarter of 2005.
>
> * * *
>
> "With the foundation for our commercial strategy firmly in place, our business momentum continues to accelerate, as evidenced by our fifth straight quarter of double-digit signings and record-breaking summer film performances," said IMAX co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. "We believe we are well positioned to ultimately bring The IMAX experience(R) to hundreds of multiplexes around the world, and we have only just begun to tap into this enormous growth opportunity."
>
> * * *
>
> "IMAX's summer films were a huge audience draw, keeping IMAX theatres packed for months," continued Messrs. Gelfond and Wechsler. "While the industry continued to struggle with box office declines, our box office was up significantly, highlighting The IMAX Experience's ability to pull movie-goers back into theatres and Warner Bros.' experience in marketing this new release window."

25. On February 17, 2006, the Company announced its anticipated 2005 results in a press release which stated in part:

> IMAX Corp. announced today that, reflecting the strong tone and momentum of its business, it expects to meet or exceed the full year 2005 guidance it provided investors of $0.35 to $0.38 in net earnings per share on a fully diluted basis.
>
> During the fourth quarter the Company completed 14 theatre installations, which is a record for a single quarter, and consistent with the guidance the Company provided. As a result, the Company installed a total of 34 theatre systems for the full year versus 21 for 2004. The Company also expects to report revenues approximately in the guided range of $145 to $150 million for all of 2005.
>
> These results are based on preliminary financial data and subject to the final closing of the Company's books and records.
>
> "IMAX's momentum and growth potential is building," said IMAX Co-Chairmen and Co-CEOs Richard L. Gelfond and Bradley J. Wechsler. "IMAX set aggressive goals for theatre signings, film performance, installations and financial results for 2005, and we are extremely pleased to report that we believe we have delivered on all fronts. Successfully completing 14 theatre system installations in the most recent quarter underscores the rapidly expanding nature of the IMAX network, an expansion that should continue to grow our recurring revenues."
>
> IMAX also announced that in addition to completing 14 theatre installations, the Company signed deals for eight theatre systems during the fourth quarter, one of which remains subject to a condition. The Company signed deals for 45 theatre systems for the full year 2005, at the high end of its 40-45 signings guidance. By comparison, the Company signed deals for 36 theatre systems in 2004, and 25 in 2003.
>
> "In addition to delivering on our financial and operational goals, we continued to deliver on our strategy of positioning IMAX as a profitable release window for Hollywood films, providing the Company with a strong platform from which to fulfill its long term potential," Gelfond and Wechsler continued. "We are very excited to enter 2006 with our strongest film slate ever, with five IMAX DMR(R) titles already secured for day and date release, and Deep Sea 3D set for release in March. With the probable addition of another title in the fourth quarter of 2006 we expect to have a film release every six to eight weeks in 2006, which, we believe, should be a major factor in driving theatre sales as well as recurring revenues."

26. On March 9, 2006, the Company issued a press release announcing its fourth quarter 2005 results. The press release stated in part:

IMAX Corporation today reported net earnings of $0.40 per diluted share for the year ended December 31, 2005. This compares to net earnings of $0.26 per diluted share reported for the year ended December 31, 2004, an increase of 62%.

For the three months ended December 31, 2005, the Company reported net earnings of $0.29 per diluted share, compared to net earnings of $0.19 per diluted share reported for the three months ended December 31, 2004, an increase of 54%.

"Our 2005 results clearly reflect that IMAX's commercial strategy is working and that the momentum in our business is continuing to grow," said IMAX Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. "We set aggressive goals for the year, and we believe our performance in 2005 demonstrates the increasing acceptance of IMAX as a commercial destination for mainstream entertainment. We believe our steadily improving financial performance shows that our strategy and The IMAX Experience (R) have been embraced by consumers, major studios and leading film exhibitors around the world."

Separately, the Company announced its Board of Directors has decided to begin a process to explore strategic alternatives to enhance shareholder value, including, but not limited to, the sale or merger of the business. The Company has retained Allen & Company and UBS Investment Bank as financial advisors in this process.

"We believe we are exceptionally well-positioned to take the next step forward in our evolution as a brand and as a company. We believe we can accelerate our growth and realize the full potential of IMAX more quickly and effectively with a strategic partner or acquirer.

* * *

"The caliber and flow of content we are providing exhibitors is unlike any in the Company's history, and we're already in discussions with several studios about the 2007 film slate. Our ability to attract studios and deliver outstanding films to the IMAX theatre network will continue to help drive IMAX's success," concluded Messrs. Gelfond and Wechsler.

For the year ended December 31, 2005, the Company's total revenues were $144.9 million, as compared to $136.0 million reported for the prior year. Systems revenue was $97.8 million versus $86.6 million in the prior year. The Company recognized revenue on 38 theatre systems which qualified as either sales or sales-type leases in the fiscal 2005, versus 22 in 2004.

27. On March 9, 2006, the Company filed its Form 10-K for the year ended December 31, 2005, which included the Company's previously reported financial results. The Form 10-K, signed by Gelfond, Wechsler and Joyce, also included certifications by Gelfond, Wechsler and Joyce

certifying the effectiveness of IMAX's internal controls. The Form 10-K represented the following with respect to internal controls:

> I, Richard L. Gelfond, Co-Chief Executive Officer of IMAX Corporation, certify that:
>
> 1. I have reviewed this annual report on Form 10-K of the registrant, IMAX Corporation;
>
> 2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
>
>    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
>    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure

controls and procedures as of the end of the period covered by this annual report based on such evaluation; and

(d) Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: March 9, 2006

By: /s/ "Richard L. Gelfond"

Name: Richard L. Gelfond
Title Co-Chief Executive Officer

28. Defendants Wechsler and Joyce signed nearly identical certifications also included in the Form 10-K.

29. On May 9, 2006, the Company issued a press release announcing its first quarter 2006 results. The press release stated in part:

> IMAX Corporation today reported a net loss of $0.14 per diluted share for the quarter ended March 31, 2006, compared to net earnings of $0.03 per diluted share reported for the three months ended March 31, 2005. The Company also announced that the process involving the potential merger or sale of the Company is proceeding well.
>
> "We are pleased that we remain on tract to grow IMAX's signings and installations – the two most important metrics of our growth – in 2006 above our exceptionally strong 2005 results," said IMAX Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. "Given our solid film slate and the large

amount of interest we are seeing from commercial exhibitors, we believe the Company will benefit from significant momentum as we look to the remainder of the year. First quarter earnings were below guidance of approximately a ten cent loss due to a number of factors, including the underperformance of V for Vendetta, which reduced earnings by two cents, the increase in non-cash compensation related to the increase in stock price after the Company's announcement of its exploration of strategic alternatives including the potential sale of the Company, which reduced earnings by one cent, as well as other non-cash expenses relating to this sale process incurred in the quarter. That said, we continued to make progress executing our core growth initiatives and implementing our commercial strategy during the first quarter. We remain optimistic that we will continue to improve upon our 2005 performance, where all of the Company's key metrics were up solidly."

The Company indicated that it continues to advance in its process of exploring and evaluating strategic alternatives to enhance shareholder value, including, but not limited to, the sale or merger of the business. Commenting on this process, Messrs. Gelfond and Wechsler stated, "We have been very pleased with the amount of interest we have seen to date and how the process is proceeding to date. We just entered the second round and are pleased to be evaluating proposals from a broad range of interested parties. We remain confident that pursing strategic alternatives for the business will enable us to expand the company's scale, accelerate its growth and enhance shareholder value."

* * *

IMAX's 2006 film slate, with a new film scheduled to open every six to eight weeks throughout the rest of the year, is the Company's strongest ever.

* * *

"We remain very excited not only about our 2006 films, but about our prospects for the 2007 slate, which are still in discussion but include some of the biggest films of the year. IMAX is clearly perceived to be a vibrant and integral component of the Hollywood release platform, and we think that our ability to deliver outstanding event films to the expanding network of IMAX theatres will continue to drive the Company's success," concluded Messrs. Gelfond and Wechsler.

For the three months ended March 31, 2006, the Company's total revenues were $20.4 million, as compared to $31.4 million reported for the prior year period. The decline in revenue is attributable to the projected decline in systems revenue due to the seasonally slow nature of first quarter installs and the fact that the company projected no consensual lease buyouts in the first quarter. Systems revenue was $9.4 million versus $22.1 million in the prior year period, when the company recognized revenue on five systems compared to three in the first quarter of 2006. There were no revenues associated with consensual lease buyouts, terminations by default and MPX conversion agreements in the first quarter. This compares to $7.1 million in settlement revenues in the first quarter of fiscal 2005.

30. On May 9, 2006, the Company filed its Form 10-Q for the period ended March 31, 2006. The Form 10-Q, signed by Joyce and Gamble, also included certifications by Wechsler, Gelfond and Joyce certifying the effectiveness of IMAX's internal controls.

31. On August 9, 2006, after the markets closed, the Company announced its second quarter 2006 results, including that the SEC was investigating the timing of its revenue recognition and that the potential sale of the Company was not progressing. The press release stated in part:

> Separately, the Company provided an update regarding its exploration of strategic alternatives, including the possible sale or merger of the company. On March 9, the Company announced it had retained Allen & Company and UBS to explore strategic alternatives. Today the Company reported that while it received significant initial interest from multiple parties, its view is that there are presently no buyers who have indicated a willingness to acquire the Company at a valuation sought by the Board of Directors. Because interest remains from several parties at lower valuation, however, the Board has authorized the Company's bankers to explore these opportunities. This process is ongoing.
>
> * * *
>
> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods. The Company recognized revenue in the fourth quarter of 2005 on 10 theatre system installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed. Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. the Company believes its application of the above accounting policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP. This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006, where revenue associated with the screen element has been deferred to a future period. The Company is cooperating in this inquiry.

32. On this news, IMAX's stock collapsed 40% to as low as $5.48 per share, before closing at $5.73 per share on volume of 13.2 million shares, 61 times the average volume.

33. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) the Company lacked requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts;

(b) the Company's financial statements were materially misstated due to its improper revenue recognition; and

(c) the Company was not able to be sold at the prices envisioned due to its lack of marketable films.

## IMAX'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

34. In order to inflate the price of IMAX stock, defendants caused the Company to falsely report its results for at least Q4 2005 through improper revenue recognition on incomplete theatre systems.

35. The Company's financial results during the Class Period were included in Forms 10-Q and 10-K filed with the SEC. The results were also included in press releases disseminated to the public.

36. IMAX has now admitted that the SEC is investigating its revenue recognition, such that the financial statements were not a fair presentation of IMAX's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

37. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular

time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

38. Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e) The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f) The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g) The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

39. Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## LOSS CAUSATION/ECONOMIC LOSS

40. By misrepresenting IMAX's financial statements, the defendants presented a misleading picture of its business and prospects. Thus, instead of truthfully disclosing during the Class Period that IMAX's business was not as healthy as represented, IMAX falsely overstated its net income.

41. These claims of profitability caused and maintained the artificial inflation in IMAX's stock price throughout the Class Period and until the truth was revealed to the market.

42. Defendants' false and misleading statements had the intended effect and caused IMAX stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $11.91 per share.

43. On August 9, 2006, the Company announced that its efforts to sell the business had failed and that the SEC was investigating its revenue recognition, causing the stock to drop 40% to $5.73 per share.

44. As a direct result of defendants' admissions and the public revelations regarding the truth about IMAX's overstatement of income and its actual business prospects going forward, IMAX's stock price plummeted 40%, falling from $9.63 per share on August 9, 2006 to $5.73 per share on August 10, 2006, a drop of $3.90 per share. This drop removed the inflation from IMAX's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

45. Plaintiff incorporates ¶¶1-44 by reference.

46. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of IMAX common stock during the Class Period.

48. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IMAX common stock. Plaintiff and the Class would not have purchased IMAX common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

49. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of IMAX common stock during the Class Period.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

50. Plaintiff incorporates ¶¶1-49 by reference.

51. The Individual Defendants acted as controlling persons of IMAX within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of IMAX stock, the Individual Defendants had the power and authority to cause IMAX to engage in the wrongful conduct complained of herein. IMAX controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

52. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased IMAX common stock on the open market during the Class Period (the "Class"). Excluded from the Class are defendants.

53. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. IMAX has more than 40 million shares of stock outstanding, owned by hundreds if not thousands of persons.

54. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether the 1934 Act was violated by defendants;

(b) whether defendants omitted and/or misrepresented material facts;

(c) whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e) whether the price of IMAX's common stock was artificially inflated; and

(f) the extent of damage sustained by Class members and the appropriate measure of damages.

55. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

56. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

57. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding plaintiff and the members of the Class damages, including interest;

C. Awarding plaintiff reasonable costs and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: September 13, 2006

**ABRAHAM FRUCHTER & TWERSKY LLP**

By: ______________________

Jack G. Fruchter (JF-8435)
Lawrence D. Levit (LL-9507)
One Penn Plaza, Suite 2805
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

**Attorneys for Plaintiff**

# PLAINTIFF'S CERTIFICATE

The undersigned ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint against Imax Corp. ("IMAX") and certain other defendants.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

5. Plaintiff made the following transactions during the Class Period in the common shares of IMAX:

**Purchases**

| Date(s) | Number of Shares | Price |
|---|---|---|
| 5/1/06 | 50 | $10.00 |
| | | |
| | | |
| | | |
| | | |
| | | |

**Sales**

| Date(s) | Number of Shares | Price |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

6. During the three years prior to the date of this Certification, Plaintiff has not moved to serve or served as a representative party for a class in an action filed under the federal securities laws.

7. I declare under penalty of perjury, this 14 day of August, 2006 that the information above is accurate.

Anthony Caiafa